* * * * * * * * * * * *Page 2 
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Taylor and the briefs and arguments of the parties. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, or rehear the parties or their representatives. The Full Commission adopts the Opinion and Award of Deputy Commissioner Taylor with modifications.
 * * * * * * * * * * *
The Full Commission finds as a fact and concludes as matters of law the following, which were entered into by parties as:
 STIPULATIONS
1. On December 9, 2004, plaintiff and defendant-employer Strober Organization were subject to and bound by the provisions of the North Carolina Workers Compensation Act.
2. On December 9, 2004, an employment relationship existed between plaintiff and defendant-employer Strober Organization.
3. The insurer for defendant-employer Strober Organization is American Casualty Company.
4. On April 1, 2005, plaintiff and defendant-employer Greenleaf Nursery were subject to and bound by the provisions of the North Carolina Workers Compensation Act.
5. On April 1, 2005, an employment relationship existed between plaintiff and defendant-employer Greenleaf Nursery.
6. The insurer for defendant-employer Greenleaf Nursery is Argonaut Insurance Company.
7. On September 7, 2005, plaintiff and defendant-employer Newcon were subject to and bound by the provisions of the North Carolina Workers Compensation Act. *Page 3 
8. On September 7, 2005, an employment relationship existed between plaintiff and defendant-employer Newcon.
9. The insurer for defendant-employer Newcon is Stonewood Insurance Company.
10. Plaintiff's average weekly wage while employed with defendant-employer Strober Organization was $403.75.
11. Plaintiff's average weekly wage while employed with defendant-employer Greenleaf Nursery was $200.29.
12. Plaintiff's average weekly wage while employed with defendant-employer Newcon was $415.52.
13. Defendant-employer Strober Organization accepted the claim on a Form 60 dated January 6, 2005.
14. Defendant-employer Greenleaf Nursery accepted the claim on Form 60 dated May 9, 2005.
15. Defendant-employer Newcon denied the claim by use of a Form 61 dated September 27, 2005.
16. The parties offered into evidence the following exhibits, as Stipulated Exhibit 1:
 (1) Harnett County EMS records for 12-09-04;
 (2) Central Carolina Hospital records of 12-09-04;
 (3) Mid Carolina Surgical Clinic (Dr. Michael A. Gordon);
 (4) Rapid Response Urgent Care;
 (5) Wilson Orthopaedic Surgery (Dr. Michael J. Kushner);
 (6) Heritage Hospital (04-01-05);
 (7) Carolina Regional Orthopaedics; *Page 4 
 (8) Nash Urgent Care (09-07-05);
 (9) Dr. Daniel E. Everhart;
 (10) Dr. Noreen Denny;
 (11) Tarboro Clinic PAI Center;
 (12) Defendant-employer Strober Organization's responses to Interrogatories and Document Requests from plaintiff. (This exhibit omits medical records as they are otherwise included. This exhibit does include the statement describing the accident by co-worker Mike Carpenter and the sketch of the accident scene done by him.);
 (13) Job description at Strober Organization;
 (14) Classified ad for Newcon, Inc. giving job description of plaintiff;
 (15) Recorded interview of client by Marta Kitzpatrick of American Casualty Insurance Company in behalf of defendant-employer Newcon;
 (16) Discharge papers by defendant-employer Newcon;
 (17) Medical authorization to defendant-employer Newcon;
 (18) Grade transcript of plaintiff at Malone High School, Saint Meridian, New Jersey;
 (19) Employee records with defendant-employer Newcon;
 (20) Defendant-employer Newcon employee review of 08-25-05. (Signed 08-30-05);
 (21) Form 22 by defendant-employer Strober Organization;
 (22) Form 22 by defendant-employer Greenleaf Nursery;
 (23) Form 22 by defendant-employer Newcon; and *Page 5 
 (24) Mediation Invoice.
17. The parties offered into evidence as Stipulated Exhibit 2 a CD/disc of additional documents including social security documents and discovery responses.
18. The parties offered into evidence the following as Stipulated exhibits:
 • Stipulated Exhbiit 3 — 488798 IC Forms;
 • Stipulated Exhibit 4 — 529727 IC Forms; and
 • Stipulated Exhibit 5 — 560117 IC Forms.
19. Plaintiff and his wife, Marina Bryant, testified on behalf of plaintiff at the hearing. Defendant-employer Strober Organization called Tom Swann to testify. Defendant-employer Greenleaf Nursery did not call any witnesses. Defendant-employer Newcon called Ricky New, Marty Baier and Marta Fitzpatrick.
20. The following were admitted into evidence as Plaintiff's Exhibits:
 • Plaintiff's 1 — A-M photos; and
 • Plaintiff's 2 — Charges for surveillance.
21. The following were admitted into evidence as defendant Newcon's exhibits:
 • Defendant's 1 — February 11, 2006 surveillance report;
 • Defendants' 2 — March 16, 2006 surveillance report;
 • Defendants' 3 — November 20 and December 6, 2006 surveillance report;
 • Defendants' 4 — Surveillance disc;
 • Defendants' 4A — Surveillance video;
 • Defendants' 5 — Surveillance disc; and
 • Defendants' 5A — Surveillance video. *Page 6 
22. Plaintiff contends that the contested issues to be decided by the North Carolina Industrial Commission are the following:
 (a) What is the amount if any of the medical and disability compensation due plaintiff from defendant-employer Strober Organization?
 (b) What is the amount if any of the medical and disability compensation due plaintiff from defendant-employer Greenleaf Nursery?
 (c) What is the amount if any of the medical and disability compensation due plaintiff from defendant-employer Newcon?
Defendant-employer Strober Organization contends that the contested issues to be decided by the Industrial Commission are the following:
 (a) Whether plaintiff sustained any permanent injury to his brain as a result of the incident of 12/9/04;
 (b) Whether plaintiff requires any ongoing medical treatment for the back injury and alleged head injury relative to the incident of 12/9/04; and
 (c) Whether plaintiff's alleged disability is causally connected to the incident of 12/9/04.
Defendant-employer Greenleaf Nursery contends that the contested issues to be decided by the Industrial Commission are the following:
 (a) Has plaintiff received all benefits to which he is entitled as a result of his April 1, 2005, back sprain?
 (b) Was plaintiff released by Dr. David Miller to full duty work on July 18, 2005? *Page 7 
 (c) Did plaintiff voluntarily resign from his employment with Greenleaf Nursery on July 23, 2005?
 (d) Is plaintiff currently disabled as a result of his April 1, 2005, injury by accident?
 (e) Pursuant to Rule 7 of the Rules for Mediated Settlement and Neutral Evaluation Conferences of the North Carolina Industrial Commission, are the defendants entitled to a credit for plaintiff's share of the mediator's fee?
Defendant-employer Newcon contends that the contested issues to be decided by the Industrial Commission are the following:
 (a) Whether plaintiff sustained a compensable injury by accident or specific traumatic incident arising out of and in the course of his employment with Newcon, Inc.?
 (b) Whether and to what extent plaintiff is disabled due to an injury by accident or specific traumatic incident with Newcon, Inc.?
 (c) Whether plaintiff's disability, if any, is due to prior compensable injuries?
 (d) Whether plaintiff's termination from Newcon, Inc. constituted a constructive refusal of suitable employment?
 * * * * * * * * * * *
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT *Page 8 
1. At the time of the hearing before the deputy commissioner, plaintiff was 41 years old. After being born in North Carolina, plaintiff moved to Connecticut when he was ten or fifteen years old. Plaintiff had not gone to school prior to moving to Connecticut. Plaintiff was in special education programs and was considered a slow learner throughout his educational history. In 1985, plaintiff eventually graduated from special education classes with a 1.1 grade point average and after a six week program to get ready to go to work, he went straight to work.
2. Following high school, plaintiff began a pattern of working in temporary labor jobs either through temporary agencies or the Employment Security Commission. Plaintiff's previous work experience was labor intensive and generally involved lifting.
3. According to plaintiff's earning records from the Social Security Administration, plaintiff earned $2,321.81 in the year he graduated from high school. Over the next nearly 20 years, plaintiff earned an average of approximately $3,590.00 each year. Over the years, plaintiff earned less than $1,000.00 for seven of them and zero dollars for two. In 2002, 2003 and 2004, plaintiff earned between $6,500.00 and $7,100.00.
4. Plaintiff has never had a driver's license either in North Carolina or Connecticut because he was unable to pass the test.
5. Prior to meeting his wife, plaintiff lived at the YMCA in Connecticut. Plaintiff met his wife, Marina Jones-Bryant, in 2001 and they were married in 2004.
6. After meeting his wife, plaintiff moved back to North Carolina and got a job with Contractor's Yard as the material handler/sheet rock helper. Plaintiff's sole job while working for Contractor's Yard was to unload the truck and carry the materials around the yard and the job site. *Page 9 
7. Plaintiff sustained an admittedly compensable injury on December 9, 2004 when he fell from the second floor landing on the first floor. Plaintiff was transported by ambulance to Central Carolina Hospital. Although he remembers being transported to the hospital by ambulance, plaintiff apparently lost consciousness for some period of time and does not have a clear recollection of the accident. In the emergency room, plaintiff was diagnosed with several injuries, including a closed head injury and back strain. As a result, he was admitted to the hospital until December 10, 2004. Thereafter, plaintiff came under the care of Dr. Michael Gordon with Mid-Carolina Surgical Clinic. Dr. Gordon released plaintiff to regular duty work, effective January 10, 2005. As a result of this injury, plaintiff bruised multiple body parts, strained his back and had a mild head injury. Plaintiff did not break any bones as a result of this fall. The CT scan of his head immediately following the accident did not show any acute intracranial abnormalities. The EEG evoked potential studies and a brain MRI done later, which were normal.
8. Plaintiff was taken out of work due to his injuries from December 9, 2004 through January 10, 2005.
9. When plaintiff returned to work on January 11, 2005, he immediately strained his back again and was removed from employment from January 12, 2005 until January 18, 2005 by the Urgent Care doctor. From January 18, 2005 until January 25, 2005, plaintiff had light duty restrictions given by Dr. Douglas Keith which were accommodated by Contractor's Yard.
10. As of January 25, 2005, plaintiff was released to return to work full duty without restrictions. Dr. Keith was of the opinion that plaintiff was malingering and discharged plaintiff from care at maximum medical improvement with no disability. *Page 10 
11. On February 1, 2005, plaintiff returned to the doctor complaining of a re-injury to his back and was released to return to work light duty for one week. The employer did not hear from plaintiff following this release to return to work and pursuant to their no-call/no-show policy, plaintiff was terminated.
12. Plaintiff was again released to return to work full duty at his follow-up appointment on February 9, 2005 by the Urgent Care doctor.
13. Plaintiff obtained employment with Greenleaf Nursery on March 9, 2005. Plaintiff's average weekly wage while employed with Greenleaf was two hundred dollars and twenty-nine cents ($200.29).
14. While employed at Greenleaf, plaintiff was responsible for the shearing of trees and bushes and lifting thirty-five to forty pound sandbags. When lifting the bags, plaintiff indicated he would lift two at a time.
15. Plaintiff testified that he injured his back during his employment with Greenleaf on or about April 1, 2005. On that date, plaintiff was lifting two sandbags when he hurt his back, causing him to fall to his knees. Other employees helped him get up from the ground and called an ambulance. He was transported to the hospital.
16. At Heritage Hospital, an interview with plaintiff revealed that he was taking "a lot of pain medicine, Percocet, Ultracet, and such for his back." Plaintiff reported having back problems for a long time and was diagnosed with back strain with radiculopathy. As a result, plaintiff was written out of work for three days.
17. On April 8, 2005, plaintiff came under the care of Dr. David C. Miller with Carolina Regional Orthopaedics. Dr. Miller diagnosed plaintiff with a lumbosacral strain and right lumbar radiculopathy. He prescribed Voltaren XR and Darvocet with physical therapy, and *Page 11 
provided plaintiff with an out of work note for ten (10) days. Dr. Miller also recommended a lumber MRI. The MRI results showed spondylosis at L4-5 and L5-6, along with central and subarticular stenosis at both levels. The test also revealed a right-sided HNP at L4-5, which Dr. Miller believed was causing nerve root compression at L5. Plaintiff continued to treat conservatively with Dr. Miller.
18. On May 20, 2005, Dr. Miller released plaintiff to light duty work. Plaintiff returned to work for Greenleaf under light duty work restrictions on the same date. On July 15, 2005, plaintiff was released to return to full duty work by Dr. Miller.
19. On July 23, 2005, plaintiff voluntarily resigned his position with defendant Greenleaf because he was moving to Rocky Mount, North Carolina.
20. On July 25, 2005, plaintiff obtained a position with defendant Newcon as a laborer. His average weekly wage while employed with Newcon was four hundred fifteen dollars and fifty-two cents ($415.52).
21. As a laborer, plaintiff was responsible for moving concrete forms and placing pins and board to mark where the concrete was to be poured. He would drive the pins into the ground with a metal mallet or sledgehammer. Additionally, he worked with a concrete machine which required him to guide the concrete shoot into the proper form. On occasion, plaintiff was also asked to direct the concrete truck as well as add water to the concrete if it was at the incorrect consistency.
22. The quality of plaintiff's work consistently failed to meet defendant Newcon's expectations. Mr. New with Newcon and plaintiff testified that plaintiff could not guide the cement truck and keep it in line with the curb machine. Plaintiff indicated he became confused when doing multiple things at once. Plaintiff could not adequately maintain an appropriate mix *Page 12 
of water and concrete. On three occasions, plaintiff ruined an entire batch of concrete because he added too much water.
23. Approximately one week prior to plaintiff's alleged injury, Mr. New told plaintiff that he had one more week to improve his performance or risk being terminated from Newcon. In response, plaintiff requested a job evaluation, which Mr. New provided. The evaluation indicated that plaintiff needed to improve his work.
24. Plaintiff alleges he injured his back at Newcon on September 7, 2005. Mr. New alleged plaintiff provided three different accounts of how the injury occurred. Plaintiff initially told Mr. New that he had injured his back while he was "knocking pins." Later in the day, plaintiff claimed he was setting an end board when injured. Plaintiff subsequently told Mr. New that the injury occurred when plaintiff attempted to load a form into the truck by himself. The three different accounts are documented in Mr. New's records from that day.
25. Plaintiff contends he was injured by lifting a 100-pound form by himself. Defendant Newcon required these heavy forms to be lifted by two employees and that no employee was to move a form alone. Mr. New testified that plaintiff's co-workers confirmed that plaintiff did not move a form by himself on the alleged date of injury. This was confirmed in Mr. New's entry from September 8, 2005. Three employees, Lugi A. Segura de la Cruz, V. Wilson, and Juan Espinoza, signed this entry.
26. Mr. New further testified that once plaintiff reported he had hurt his back, Mr. New told him to take it easy. At that point, plaintiff stood by the work truck. Mr. New testified that plaintiff would "walk funny" when he noticed that he was being watched. Mr. New testified that plaintiff had been working for ten minutes when he indicated he had hurt his back, and that *Page 13 
he never insinuated that he was in any pain when Mr. New and plaintiff were on the way to the emergency room.
27. Plaintiff presented to Nash Urgent Care on September 7, 2005. He was taken there by Mr. New. It was noted that plaintiff picked up concrete at work and felt pain in his lower back and left leg. Plaintiff was written out of work on September 8, 2005 and was ordered to remain on light duty through September 14, 2005. Plaintiff returned to work at light duty on September 9, 2005.
28. Plaintiff was terminated from Newcon on September 12, 2005. Mr. New testified that plaintiff was terminated due to a pattern of false reporting that he had completed a task. On the day plaintiff was terminated, Mr. New asked plaintiff to help a worker set forms by handing him pins and making sure he had what was needed. This work was within plaintiff's light-duty work restrictions. Plaintiff was assigned to help a particular worker. Mr. New testified that he watched the worker do the job with no help from plaintiff. He testified that plaintiff walked down the street and talked to someone in a car rather then helping the worker. When Mr. New asked plaintiff why he had not helped, plaintiff claimed he had assisted with setting the form. When Mr. New revealed what he had observed, plaintiff argued with him. Mr. New terminated plaintiff's employment at that time. Mr. New's records noted that plaintiff "continues to leave assigned tasks before completion" and that he "lied about helping out."
29. Mr. New terminated plaintiff based on this culmination of incidents of unsatisfactory performance. Mr. New testified that plaintiff would watch others do work with the expectation of learning how to do the work, but that plaintiff was apparently incapable of fully understanding the process. He testified that plaintiff did not listen or follow instructions *Page 14 
and was not aware of his surroundings. He testified that plaintiff was provided a chance to improve and did not have any desire to do so.
30. After being fired form Newcon, plaintiff has not sought or obtained work.
31. On September 15, 2005, plaintiff returned to Dr. Miller for medical treatment. Dr. Miller's medical records indicate he believed plaintiff suffered a "re-exacerbation of work related injury from 4/1/07 with radiculopathy bilaterally due to disc disease at L3-4 and L4-5, stenosis at L3-4 and L4-5 and HNP at L4-5."
32. However, after Dr. Miller learned of plaintiff's injury on December 9, 2004 and had an opportunity to review the medical records related to that incident, it is now Dr. Miller's opinion that plaintiff's back complaints are the result of his December 9, 2004 injury and that the incidents on April 1, 2005 and September7, 2005 amount to exacerbations of this original injury.
33. Plaintiff continued to treat with Dr. Miller, with appointments on October 10, 2005 and December 6, 2005. On January 5, 2006, Dr. Miller recommended an updated MRI and surgical intervention. Plaintiff obtained a MRI on May 25, 2006 which changed Dr. Miller's opinion on the type of surgery recommended. Plaintiff scheduled and cancelled the recommended surgery twice, in June 2006.
34. On September 26, 2006, plaintiff provided a recorded statement to Marta Fitzpatrick, the adjuster assigned to this claim. Plaintiff stated that he had never filed a workers' compensation claim. He stated that he had never had any problems with his back. Plaintiff stated that he was fired on September 12, 2005, when Mr. New called him into his office and terminated his employment for lying. Plaintiff said that Mr. New reminded him that this was not his first warning. *Page 15 
35. Ms. Fitzpatrick testified that an ISO claims search revealed that plaintiff had multiple workers' compensation claims. The search revealed that plaintiff had a workers' compensation claim for the December 9, 2004 back injury with Strober, for the January 11, 2005 lower back strain with Strober, and for the April 1, 2005 injury during his employment with Greenleaf.
36. Ms. Fitzpatrick contacted plaintiff again on September 26, 2005. Plaintiff was asked if he had ever had any problems with his back or if he had any other workers' compensation injuries. He responded "no" to these questions. Ms. Fitzpatrick then questioned plaintiff about his workers' compensation claim of December 2004 with Strober. Plaintiff confirmed that he did file a claim as a result of that injury. He was then questioned about a workers' compensation claim in January of 2005 with Strober. Plaintiff stated that this was the same claim as the previous one. Plaintiff was then questioned about the workers' compensation claim resulting from the April 2005 injury while employed at Greenleaf. Plaintiff then stated that he had an open back claim with Greenleaf. He stated that neither claim was settled.
37. Surveillance was obtained on March 16, 2006. Plaintiff was observed leaving a home improvement store with a 50-pound bag of concrete mix and placing it inside a mini-van. Plaintiff was then observed exiting a Habitat for Humanity store with a five gallon bucket in each hand, although these buckets may not have been full. Plaintiff was later observed stirring paint in the same bucket he had been carrying. Marina Bryant, plaintiff's wife, testified that plaintiff painted the ceiling of the foyer in their house in March of 2006. She indicated that he used a roller with an extension pole. On March 16, 2006, plaintiff was also observed carrying two garbage cans and carrying a large, framed picture. *Page 16 
38. On November 2006, additional surveillance was obtained. Mr. Baier, the investigator, testified that he approached an abandoned house near plaintiff's home in order to get a better look at some activity he noticed in plaintiff's yard. He testified that plaintiff approached him and asked him why he was looking at the house and if he was interested in buying it. Plaintiff told Mr. Baier that he did handyman repair work and that he was a good painter. Mr. Baier testified that plaintiff requested that Mr. Baier hire him to repair the home.
39. Mr. Baier also observed plaintiff carrying items with a shovel and carrying a bucket full of water. Plaintiff was observed chasing a loose dog until he was out of view of surveillance. Mr. Baier never saw plaintiff limp. Plaintiff was also observed riding a bicycle with no apparent difficulty. At one point plaintiff bent down to the ground to pick up an object while still seated on the bike.
40. Dr. David Miller was deposed on May 10, 2007. Plaintiff's counsel asked for Dr. Miller's opinion as to which incident (12/09/04, 04/01/05, 09/07/05) caused the problems plaintiff reported during his April 8, 2005 visit. After reviewing the records, Dr. Miller testified that, assuming plaintiff did not have any previous back or leg problems prior to the December 9, 2004 incident that incident started plaintiff's back problems and the other two incidents exacerbated them. Dr. Miller later indicated that he could not say the September 2005 incident was a significant exacerbation.
41. Dr. Miller testified that the surveillance tape showing plaintiff removing 50-pound bags of Quick Crete from a shopping cart and placing them into a van would change his opinion with regard to the severity of plaintiff's pain complaints. Dr. Miller opined that if plaintiff could lift a 50-pound bag of concrete, he was having a diminished degree of pain than what he was reporting. *Page 17 
42. Dr. Miller then reviewed surveillance reports previously admitted into evidence. He testified that overall plaintiff's actions in the report were inconsistent with his presentation to Dr. Miller. He recalled that plaintiff limped, moved slowly, and complained of pain during examinations, and that the surveillance reports and pictures did not correlate with plaintiff's presentation during appointments. He noted that plaintiff rode a bicycle and that there was a picture of plaintiff bending to pick something off the ground while seated on the bike. Dr. Miller opined that bending to the ground while seated on a bike exceeded plaintiff's in-office presentation.
43. Dr. Miller opined that three different surveillance reports, which documented plaintiff's activity on six different days, indicated that plaintiff was not in the amount of pain that he reported during office visits. Dr. Miller rescinded his surgical recommendation based on his review of the surveillance. Dr. Miller testified that, based on the surveillance, he would release plaintiff to his regular job, doing heavy physical labor. He changed his opinion regarding plaintiff's impairment ratings and assigned plaintiff a 0% impairment rating. He reiterated that the surveillance showed that plaintiff was doing more and was capable of doing more than he reported in office visits.
44. Submitted into evidence at the hearing was defendants' Exhibits 1 through 3 representing surveillance reports dated February 11, 2006, March 16, 2006 and November 20, 2006. Additionally, surveillance video documentation was entered into evidence as Defendants' Exhibit 4 and 5. Marty Baer, a private investigator, procured the surveillance video and issued the corresponding reports. Mr. Baer testified at the hearing regarding his surveillance of plaintiff. Defendants' Exhibits 1 through 5 are found to accurately represent the claimant's *Page 18 
activities during the time Mr. Baer observed him and therefore, the surveillance exhibits are deemed to be credible evidence.
45. There is no credible evidence that plaintiff is under any work restrictions or medically restricted from working in any capacity for either a head injury and back injuries.
46. Plaintiff's wife, Marina Jones-Bryant testified that her husband has never had a driver's license and that she does all of the driving and has always done all of the driving. Mrs. Bryant maintains the household finances, pays the bills, and balances the checkbook and has always done this throughout their marriage, even prior to plaintiff's compensable injury of December 9, 2004.
47. Mrs. Bryant testified that plaintiff is capable of helping her maintain the house in that he takes out the trash, rakes leaves, uses the weed eater and mows the lawn. Mrs. Bryant testified that plaintiff has also painted the ceiling of the hallway of their home and has helped mix concrete in order to put into the holes of a basketball hoop for her son.
48. Mrs. Bryant testified that she has always handled the affairs of the household for her husband since she met him.
49. The Full Commission finds that the head injury of December 9, 2004 has not changed the manner in which plaintiff engages in his household activities.
50. Mr. Tom Swann testified on behalf of defendant Contractor's Yard. Mr. Swann was the warehouse manager for Contractor's Yard. His job duties included overseeing the operation of the warehouse and dealing with the delivery manager. Mr. Swann was responsible for hiring plaintiff.
51. Mr. Swann reported that plaintiff worked on a crew of three members consisting of one driver and two helpers, with plaintiff being one of the helpers. The driver was responsible *Page 19 
for making sure that the plaintiff was doing what he was supposed to do and getting to the proper job site. Plaintiff's sole responsibility was to pick up the sheet rock off the back of the truck and move it inside the job site so the workers could put it up.
52. Mr. Swann testified that plaintiff's mental abilities were satisfactory for the job he was hired to perform. Mr. Swann stated that plaintiff seemed to be someone who required constant guidance.
53. Mr. Swann testified that it was understood around the job site that plaintiff was slow and that he remembered plaintiff having trouble signing, reading and writing. Mr. Swann saw no change in plaintiff's mental abilities after the December 9, 2004 accident as compared to before.
54. Dr. Noreen Denny, a neuropsychologist, evaluated plaintiff on September 6 and September 26, of 2006. Dr. Denny was asked to perform a neuropsychological evaluation which is an evaluation to assess a person's cognitive functioning, to find out what their areas of strengths and weaknesses are and to try to determine whether there was any departure from prior functioning as an indication for brain injury.
55. Dr. Denny's summary of test results was that she considered plaintiff's neuropsychological evaluation invalid. Plaintiff failed on one test of symptom validity, which was typically performed well by individuals even with severe traumatic brain injury. Plaintiff failed on various aspects of another symptom validity test where he performed below individuals with even severe traumatic brain injury on items which were typically very easy, even for those individuals. Plaintiff's performance was below those seen for elderly individuals hospitalized for advanced dementia. Plaintiff displayed improbable patterns of performance, where scores were much higher on more difficult aspects of the test while scores were extremely low on very *Page 20 
easy aspects. Furthermore, on some aspects of each test, plaintiff scored below chance, where he would have done better by guessing alone.
56. Plaintiff's overall profile of scores was almost global impairment and functioning that was not consistent with the severity of injury as reported in his available medical records.
57. Dr. Denny was asked whether she could state to reasonable degree of psychological certainty whether the head injury of December 9, 2004 caused a decrease or worsening of plaintiff's pre-morbid level of functioning. Dr. Denny responded that typically when people suffer a mild traumatic brain injury they fully recover and that plaintiff should have recovered from a brain injury perspective over the course of three months and not have any lasting deficits related to it. Unfortunately, because plaintiff did not put forth a full effort, she was unable to opine whether plaintiff was capable from a cognitive perspective to perform simple routine tasks or perform in a competitive work environment.
59. Dr. Denny was of the opinion that there was a good chance that plaintiff was malingering during his evaluation.
60. Dr. Michael Kushner was deposed on May 24, 2007. Dr. Kushner testified that he is a board-certified neurologist having experience and training with traumatic brain injuries. Dr. Kushner testified that he treated plaintiff after he sustained a fall on December 9, 2004. He believed plaintiff had a syndrome of problems resulting from the head injury that could be classified as traumatic brain injury syndrome or post-concussion syndrome.
61. Dr. Kushner testified to a reasonable degree of medical certainty that plaintiff's head injury of December 9, 2004 caused an intellectual decline, loss of vigor, lack of coordination, pain and a decline in his ability move around. He then testified that plaintiff's head *Page 21 
injury of December 9, 2004 resulted in cognitive or intellectual loss and chronic pain that interfere with his ability to maintain a schedule, show up for work and do a job.
62. Without having the benefit of any cognitive testing, Dr. Kushner opined that plaintiff suffered cognitive or intellectual loss after the injury, which caused him to be unable to maintain a schedule, show up for work or do the job.
63. Given Dr. Kushner's failure to consider all of the evidence, Dr. Kushner's opinion is given less weight than the opinions of Dr. Denny, the neuropsychologist, and Dr. Miller, the orthopaedic surgeon.
 * * * * * * * * * * *
Based upon all the competent evidence from the record, the Full Commission finds as follows:
 CONCLUSIONS OF LAW
1. Disability within the meaning of the North Carolina Workers' Compensation Act is defined as "incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or any other employment." N.C. Gen. Stat. § 97-2(9) (2005). Plaintiff bears the initial burden of proving disability. Johnson v. S. Tire Sales Serv., 358 N.C. 701, 599 S.E.2d 508 (2004).
2. This burden requires that plaintiff demonstrate that he is (1) incapable of earning pre-injury wages in the same employment; (2) incapable of earning pre-injury wages in any other employment, and (3) that the incapacity to earn the same wages was caused by the injury or disease. See Hilliard v. Apex Cabinet Co., 305 N.C. 593, 595,290 S.E.2d 682, 683 (1982).
3. In the case sub judice, plaintiff has not met his burden of proving disability due to a back injury. During his deposition, Dr. Miller reached the conclusion that surveillance *Page 22 
depicted plaintiff acting inconsistently with his presentation to Dr. Miller. Consequently, Dr. Miller released plaintiff to full-duty work. The medical opinion testimony proves that plaintiff has a full-duty release with respect to any alleged back injury. Plaintiff has no recommendation for surgery, and he has no permanent partial impairment rating.
4. Plaintiff sustained an admittedly compensable specific traumatic incidents and accidents while working for Strober on December 9, 2004 and January 11, 2005, and another admittedly compensable specific traumatic incident while working at Greenleaf on April 1, 2005. N.C. Gen. Stat. § 97-2(6). Plaintiff has failed to prove by the greater weight of the evidence that any of these compensable incidents continues to disable plaintiff with respect to his back. Plaintiff has alleged that he sustained a specific traumatic incident on September 7, 2005, while employed at Newcon. As this allegation is not deemed credible, plaintiff did not sustain a specific traumatic incident arising out of and in the course of his employment with defendant Newcon. However, even had plaintiff's alleged injury of September 7, 2005 been found compensable, plaintiff has failed to prove by the greater weight of the evidence that he continues to be disabled with respect to his back.Hilliard v. Apex Cabinet Co., 305 N.C. 593, 595, 290 S.E.2d 682, 683
(1982).
5. Plaintiff has not met the burden of proving he has ongoing disability due to any alleged injury to his back.An injured worker may meet his "disability" burden by any of the four methods outlined by inRussell v. Lowes Product Distribution:
 (1) the production of medical evidence that he is physically or mentally, as a consequence of the work related injury, incapable of work in any employment; (2) the production of evidence that he is capable of some work, but that he has, after a reasonable effort on his part, been unsuccessful in his effort to obtain employment; (3) the production of evidence that he is capable of some work but that it would be futile because of pre-existing conditions, i.e., age, inexperience, lack of education, to seek other employment; or (4) *Page 23 
the production of evidence that he has obtained other employment at a wage less than that earned prior to the injury." 425 S.E.2d 454, 457 (1993).
Plaintiff has failed to meet his burden of proving disability for any time period for which he has not previously received compensation, in any of his three claims. Therefore, he is not entitled to any additional indemnity benefits under the North Carolina Workers' Compensation Act.Id.
6. Plaintiff experienced a mild head injury as a result of the December 9, 2004 incident. Plaintiff has failed to prove by the greater weight that he is in need of any additional treatment relative to this condition either. N.C. Gen. Stat. § 97-25.
7. Plaintiff has failed to prove by the greater weight that he has suffered any permanent damage to his brain or disability as a result of the December 9, 2004 incident.
 * * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 ORDER
1. Plaintiff is not entitled to any further medical or indemnity benefits as a result of the injuries sustained on December 9, 2004 to his head and back or on April 1, 2005 to his back.
2. Plaintiff's claim for injury on September 7, 2005 is hereby DISMISSED.
3. Defendants shall pay the costs, equally, including an expert witness fee of $600.00 to Dr. Denny.
This the 7th day of July 2008.
 S/___________________
 BUCK LATTIMORE
 COMMISSIONER *Page 24 
CONCURRING:
 S/___________________ CHRISTOPHER SCOTT COMMISSIONER
 S/___________________ DANNY L. McDONALD COMMISSIONER *Page 1